UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| 3D DESIGN SOLUTIONS LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § | No. 3:12-cv-00625-M |
| CADENCE DESIGN SYSTEMS, INC., and STMICROELECTRONICS, | § § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Motion to Dismiss Plaintiff's Original Complaint or, in the Alternative, to Stay Pending Arbitration, filed by Defendants Cadence Design Systems, Inc. ("Cadence") and STMicroelectronics, Inc. ("ST") (collectively "Defendants") [Docket Entry #18]. Defendants move for dismissal pursuant to Fed. R. Civ. P. 12(b)(1), arguing that Plaintiff 3D Design Solutions LLC ("Plaintiff" or "3D") cannot establish standing to sue Defendants for patent infringement, and as a result, that the Court lacks subject matter jurisdiction over the claims. For the reasons set forth below, the Motion is **DENIED**.

I.  BACKGROUND

In April 2009, Lisa McIlrath ("McIlrath") secured a patent, U.S. Patent No. 7,526,739 (the "'739 patent"), on her invention covering methods and systems for computer aided design ("CAD") of 3D integrated circuits. Defs.' Mot. 3. On December 18, 2008, eight months before the patent issued, McIlrath assigned all rights to the invention described in the patent application to R3 Logic, Inc. ("R3 US"). Pl.'s App. 45. On October 4, 2011, R3 US transferred its rights to the '739 patent to Acacia Research Group LLC ("Acacia"), which, in turn, transferred its rights to 3D on January 4, 2012. Pl.'s App. 5, 48.

In 2008, a number of European entities formed a consortium through the Catrene Frame Agreement ("CFA") to "promote transnational collaboration and to facilitate public and private funding for projects to advance European innovation." Defs.' Mot. 4. *See* Defs.' App. 2. On March 2, 2011, various parties to the CFA, including R3 Logic France ("R3 France") and three companies affiliated with the Defendants in this case, Cadence Design System SAS, STMicroelectronics SAS, and STMicroelectronics SA, formed the Catrene Project Co-operation Agreement ("PCA") to govern a research project related to the development and implementation of electronic design automation software and technologies. Defs.' App. 21–54. The PCA signatories agreed to grant each other access rights to certain kinds of intellectual property related to the project, on terms outlined in the agreement. The PCA purports to extend those access rights not just to the agreement's signatories, but also to the signatories' affiliated companies. R3 US did not sign the PCA or the CFA.

Defendants assert that in March, 2011, by signing the PCA, R3 France granted Defendants' affiliates a license to the '739 patent, and therefore, that Plaintiff, whose rights are derived from a January 2012 assignment, does not have exclusive rights to the patent, and thus does not have constitutional or prudential standing to bring the claims asserted in this case. Alternatively, they argue this litigation should be stayed, pending mandatory arbitration in Belgium under the PCA. In response, Plaintiff contends that: (1) R3 US and R3 France are not affiliated companies, so the PCA does not affect the right of R3 US to license or assign the '739 patent; (2) the PCA's access rights provisions do not cover the '739 patent; and (3) R3 France lacked authority to assign rights to the '739 patent.

II.  LEGAL STANDARD

A.  Fed. R. Civ. P. 12(b)(1)

A motion to dismiss under Rule 12(b)(1) challenges a federal court's subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  Federal courts are courts of limited jurisdiction; without jurisdiction conferred by statute, they lack the power to adjudicate claims.  *See Stockman v. Fed. Election Comm'n,* 138 F.3d 144, 151 (5th Cir. 1998).  "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits."  *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir. 2001) (citing *Hitt v. City of Pasadena,* 561 F.2d 606, 608 (5th Cir. 1977) (per curiam)).  Considering Rule 12(b)(1) motions first "prevents a court without jurisdiction from prematurely dismissing a case with prejudice."  *Id.*  When the court dismisses for lack of subject matter jurisdiction, that dismissal "is not a determination of the merits and does not prevent [a party] from pursuing a claim in a court that does have proper jurisdiction."  *Id.*

The Fifth Circuit recognizes a distinction between a "facial attack" and a "factual attack" upon a pleading's subject matter jurisdiction.  *Rodriguez v. Tex. Comm'n on the Arts,* 992 F. Supp. 876, 878 (N.D. Tex. 1998).  "A facial attack requires the court merely to decide if the [claimant] has correctly alleged a basis for subject matter jurisdiction" by examining the allegations in the complaint, which are presumed to be true.  *Id.* (citation omitted).  If the challenger supports the motion with evidence, as is the case here, then the attack is "factual" and "no presumptive truthfulness attaches to the [claimant's] allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."  *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir. 1981).  Regardless of the attack, "[t]he [claimant] constantly bears the burden of proof that jurisdiction does exist."

*Rodriguez,* 992 F. Supp. at 879 ("The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction.") (citations omitted).

   B.  Standing

The party seeking to invoke federal jurisdiction has the burden of establishing standing. *United States v. Hays*, 515 U.S. 737, 743 (1995). Constitutional standing analysis includes three elements: (1) the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted). "[T]he touchstone of constitutional standing in a patent infringement suit is whether a party can establish that it has an exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right to suffer legal injury." *WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1265 (Fed. Cir. 2010).

Beyond these three constitutional requirements, there are additional, prudential standing limitations, including the requirement that a plaintiff must assert its own legal rights and interests, and cannot rest its claim to relief on the legal rights or interests of third parties. *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Prudential standing in a patent infringement suit is satisfied where a plaintiff holds "all substantial rights in the patent." *Int'l Gamco, Inc. v. Multimedia Games, Inc.*, 504 F.3d 1273, 1276 (Fed. Cir. 2007) (citations omitted).

III. ANALYSIS

The standing issue here turns on two questions: (1) whether R3 France licensed the rights to the '739 patent to Defendants' affiliates through the PCA, and (2) if so, whether it had the authority to do so.

A. Scope of the PCA's Access Rights

1. Affiliates or Affiliated Companies?

One question in this dispute is whether, in determining if the parties to this litigation are bound by the PCA's "access rights" provisions, the Court should rely on the CFA's definition of "Affiliated Company," or the PCA's definition of "Affiliate." Defendants contend the arguably more expansive term, "Affiliate," should apply; Plaintiff advocates for the more restrictive term, "Affiliated Company."[1]

Article IX of the CFA sets forth the "access rights for exploitation and commericalisation," and defines the rights and obligations of the "CATRENE Partners" in relation to the parties' intellectual property.[2] Defs.' App. 17–19. Article 7 of the PCA—"ownership of foreground and intellectual property rights"—amends Article IX of the CFA.

---

[1] It is not immediately clear that this distinction makes a difference. As explained in section III.A.2. *infra*, companies are Affiliated Companies under the CFA if a party controls, directly or indirectly, more than 50% of the voting shares of both companies. Defs.' App. 4. Similarly, under the PCA, "Affiliates" are companies "directly or indirectly owned or controlled by a Party . . . through the direct or indirect (i) ownership of more than 50% of the nominal value of the issued equity share capital or of more than 50% of the shares entitling the holders to vote for the election of directors." Defs.' App. 24. R3 US and R3 France are likely Affiliates, as defined by the PCA, *and* Affiliated Companies, as defined by the CFA. Nevertheless, the Court stops short of making such a ruling, and proceeds to determine which definition applies.

[2] Article IX of the CFA refers to "Industrial" property rights and licensing. As seemingly do the parties, the Court assumes that "Industrial" is a typographical error, and that it should read "Intellectual." That appears to be how the rights are referenced in Article 7 of the PCA. This conclusion is bolstered by the fact that the "Foreground" and "Background" referenced within Article IX of the CFA govern copyrights, patent rights, and other intellectual property. Defs.' App. 56.

Among other things, Article 7 extends certain rights and obligations found in Article IX to parties to the PCA, and to the parties' "Affiliated Compan[ies]." Defs.' App. 29. The question is whether, in interpreting Article 7 of the PCA, the Court should apply the definition of Affiliated Company or Affiliate.

While the CFA defines "Affiliated Company," the PCA does not. Defs.' App. 4, 24. Instead, the PCA incorporates all of the CFA's definitions, and then defines additional terms, including "Affiliate." And yet, the term Affiliate appears only in the PCA's definitional section; the remainder of the document, including Article 7, references only "Affiliated Compan[ies]."

Plaintiff argues that the PCA's unambiguous references to Affiliated Company, rather than Affiliate, compel the Court to import the PCA's definition of Affiliated Company. Defendants contend that the PCA drafters would not have explicitly defined Affiliate differently from Affiliated Company if they did not intend for the revised definition to control. To ignore the PCA's definition of Affiliate and import the CFA's definition of Affiliated Company, Defendants argue, would effectively render the term Affiliate meaningless. According to Defendants, courts are to avoid interpreting contracts in ways that convert a term or provision into mere surplusage.

Plaintiff has the better of these arguments. Defendants' proposed construction cannot prevail over the PCA's plain meaning. Concededly, it is difficult to discern what the PCA drafters intended in defining Affiliate if not to substitute for the CFA's Affiliated Company definition. As Defendants note, if that definition does not govern the interpretation of Affiliated Company in the PCA, then it serves no purpose, and is indeed mere surplusage.

Nonetheless, "[w]hen a contract is expressed in unambiguous language, its terms will be given their plain meaning and will be enforced as written." *Reliant Energy Services, Inc. v.*

*Enron Canada Corp.*, 349 F.3d 816 (5th Cir. 2003).  Here, the PCA explicitly incorporates the CFA's definitions, including that of an Affiliated Company.  In other words, the PCA defines, either explicitly or by reference, both Affiliated Company and Affiliate.  With that in mind, the PCA's multiple references to Affiliated Companies are best interpreted through the definition of that precise term.  If the PCA drafters had intended the Affiliate definition to supersede the definition of Affiliated Company they could have made that clear, either by using the term Affiliate in the body of the PCA or by declining to incorporate the CFA's definition of Affiliated Company.  They did not do so.  Accordingly, the Court will use the CFA's definition of Affiliated Company to interpret the provisions of the PCA that reference Affiliated Companies.

    2.  Are R3 US and R3 France Affiliated Companies?

The CFA defines an Affiliated Company as:

> [1] Any company or other legal entity, [(a)] of which a CATRENE Partner . . . owns or controls directly or indirectly more than 50% of the voting shares or [(b)] by which a CATRENE Partner . . . is owned or controlled directly or indirectly by more than 50% of the voting shares. . .
>
> [2] Affiliated Companies . . . are also such companies or legal entities which are in the same ownership or under the same control in the aforementioned sense as the respective CATRENE Partner.
>
> [3] Affiliated Companies . . . are also such companies or legal entities, which are commonly controlled in the aforementioned sense by these CATRENE Partners.

Defs.' App. 4.  Defendants do not claim that R3 France is a company or legal entity that owns more than 50% of the voting shares of R3 US, as outlined in section 1(a), or that R3 US owns more than 50% of the voting shares of R3 France, as outlined in section 1(b).  Instead, Defendants argue that R3 US and R3 France are companies or legal entities that are commonly owned or controlled, in the way defined by section 1, and are therefore Affiliated Companies

pursuant to section 2.  Specifically, Defendants contend that the inventor, McIlrath, is the direct majority shareholder of R3 US and the indirect majority shareholder of R3 France.

Plaintiff's counterargument hinges on a strained interpretation of "the aforementioned sense."  Plaintiff contends that section 2's reference to section 1 implies that companies are affiliated under section 2 only if they are owned or controlled by a common *company or legal entity*, and not if they are commonly controlled by a natural person.  The Court rejects this argument.  "[T]he aforementioned sense" clause in sections 2 and 3 modifies the "ownership and control" clauses.  In section 1, ownership or control is defined as a direct or indirect ownership or control of more than 50% of the voting shares.  The same definition applies to ownership and control in section 2.  Plaintiff's proposed additional restriction—that a company or legal entity must exert common control or ownership—lacks support in the contract's syntax.  Affiliated Companies must themselves be companies or legal entities, but to be affiliated pursuant to section 2 requires only that the companies share a direct or indirect majority shareholder, and not that the common shareholder be a company or legal entity.

      3.   Does Lisa McIlrath control, directly or indirectly, more than 50% of the voting shares of both R3 US and R3 France?

It is undisputed that R3 France has three shareholders: R3 US owns 13.8%, McIlrath owns 42.9%, and McIlrath's husband, Patrick J. Botti ("Botti") owns 43.3%.  Pl.'s App. 26, McIlrath Decl. at ¶24.  As to R3 US, Defendants assert, and Plaintiff does not dispute, that McIlrath "controls" it and is its "majority owner."  Defs.' Reply 1, 3.  Defendants have not introduced any evidence in support of this position; instead, they argue that "Plaintiff's failure to disclose McIlrath's ownership interest in R3 US amounts to a tacit admission that she is a majority shareholder."  Defs.' Reply 5.  Because it is Plaintiff's burden to establish jurisdiction

by a preponderance of the evidence, *SmallBizPros, Inc. v. MacDonald*, 618 F.3d 458, 461 (5th Cir. 2010), the Court will assume, for the purpose of this Motion, that McIlrath is a majority shareholder of R3 US.

According to Defendants, this establishes indirect common control: McIlrath's 42.9% share of R3 France, combined with the 13.8% share McIlrath allegedly controls through her majority ownership of R3 US, totals 56.7% of the voting shares of R3 France. It does not necessarily follow, however, that this aggregation constitutes the kind of indirect control contemplated by the PCA. In the absence of any authority indicating otherwise, the Court concludes that the plain meaning of indirect ownership or control does extend to the facts at bar: McIlrath directly owns more than 50% of R3 US and, as a result of that majority ownership, indirectly controls 13.8% of R3 France's votes. That indirect control, combined with the direct control stemming from her direct ownership of 42.9% of R3 France, gives McIlrath control over more than 50% of the voting shares of R3 France as well, and makes R3 US and R3 France Affiliated Companies, as defined by section 2 of the PCA.

    4.   Do the access rights encompass the '739 patent?

Defendants argue that under the PCA, all signatories and their affiliates are entitled to freely use, or acquire a favorable license to use, certain intellectual property held by other signatories, including the '739 patent. Article 7 of the PCA governs the "ownership of foreground and intellectual property rights" among PCA parties. Defs.' App. 21. That article incorporates and adds to the provisions of Article IX of the CFA. The CFA, in turn, relies on definitions found in the General Conditions to the EU 7th Framework Programme Grant Agreement ("FP7 Agreement"). *Id.* at 4, 21.

The FP7 Agreement defines "access rights" as "user rights to foreground or background." Defs.' App. 56. "*[B]ackground* is information which is held by *beneficiaries* prior to their accession to this agreement, as well as copyrights or other intellectual property rights pertaining to such information . . . the use of which is needed for carrying out the project or for using foreground." *Id.* Defendants have not provided the section of the FP7 Agreement that defines "beneficiary," but it is clear from the FP7 Agreement's definition of "affiliated entity" that, as applied here, beneficiaries are the signatories to the PCA, and not the Affiliated Companies. *See id.* "*[F]oreground* means the results . . . generated under the *project*" including "patent rights." *Id.*

Given the Court's holding in section III.B. *infra*, the Court need not resolve the full scope of the access rights at this time. Under the Court's preliminary analysis, however, the '739 patent does not appear to be "background." R3 France, the beneficiary, did not hold the '739 patent prior to acceding to the contract, or at any other time. Nor does Defendants' cited evidence support the conclusion that the '739 patent covers the methods or technology necessary to carry out the PCA's project or the "foreground." Thus, the provisions of the PCA Article 7 and CFA Article IX, which govern the royalty-free and preferable licensing of background between the Catrene Partners, do not apply.

Neither does the '739 patent appear to be "foreground." Defendants do not argue that the '739 patent was generated under the project; clearly it was not. Instead, Defendants rely on Article 7.5 of the PCA which provides: "[T]he deliverable named '3D CAD Flow' [(the "deliverable")] shall be deemed as jointly owned Foreground. As consequence of the foregoing, each of the Parties shall be entitled to use and to license the said 3D CAD flow without any financial compensation to or the consent of other parties." Defs.' App. 30–31. Plaintiff contends

that the deliverable is merely a document and not "an apparatus, a piece of software or a methodology that embodies the teachings of the '739 patent." Defs.' Resp. 17.  It is not clear what it means to use and license the deliverable if it is merely a document.  Nevertheless, Defendants fail to counter this argument or to explain what, exactly, the deliverable entails.  Based on the existing record, the Court cannot conclude that the '739 patent is a part of the deliverable, or therefore, that Defendants received a license to it through the PCA.

  B. Did R3 France have the authority to bind R3 US or to assign its intellectual property?

Even if the Court determines that the PCA, by its own terms, applies to R3 US, and purports to license the '739 patent to Defendants, the Court must determine whether R3 France had the ability to bind R3 US or to license its property.  No party disputes that R3 France expressly acceded to the PCA, but that R3 US did not.

It is axiomatic that a party cannot sell what it does not own.  Nor can it grant rights to a patent it does not hold.  The PCA signatories may have intended to contribute the intellectual property of their affiliates to the consortium, but that does not mean that they had the authority to do so.  Plaintiff has made at least a *prima facie* case that R3 US and R3 France are separate legal entities, and that R3 US, not R3 France, held the exclusive rights to the '739 patent.  *See* Pl.'s App. 26–28, McIlrath Decl. (describing how the companies are legally distinct and separately owned, and explaining that R3 US did not authorize R3 France to license or assign rights to the '739 patent).  Accordingly, no matter what privileges the PCA claims to bestow, R3 France could not have contributed access rights to the '739 patent to the consortium. Thus, the Motion to Dismiss is **DENIED**.

Similarly, Defendants have not shown that, at the time the PCA was executed, the holder of the '739 patent, then R3 US, agreed to resolve any dispute arising from the PCA through

arbitration in Belgium.  The PCA unequivocally mandates binding arbitration of "all disputes or differences arising in connection with this PCA," but neither R3 US, the existing holder of the '739 patent, nor Plaintiff, the current holder of the patent, signed that agreement.  As mentioned, the fact that R3 US and R3 France are affiliated companies, as defined by the PCA, does not itself grant R3 France the authority to bind R3 US or its successors to any contractual provision.[3]  As such, the Motion for a Stay Pending Arbitration is also **DENIED**.

Defendants express suspicion that "McIlrath and Botti have operated R3 US and R3 France to manipulate the Cartrene Programme," and that the two companies are in fact "a single business entity."  Defs.' Final Reply 3; Defs. Mot. 7.  But, at this juncture, Defendants have not presented sufficient evidence or argument to persuade the Court that, as a matter of law, the companies are so connected that one could assign the other's patent or bind it to a contract.

**SO ORDERED**.

March 31, 2013.

**BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS**

---

[3] The Court declines to consider the Defendants' alter-ego theory, raised only in a footnote in its reply brief.